[Cite as *In re S.A.*, 2017-Ohio-8792.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2017-07-092 |
| | | CA2017-07-093 |
| S.A., et al. | : | CA2017-07-094 |
| | | CA2017-07-095 |
| | : | CA2017-07-096 |
| | | CA2017-07-097 |
| | : | CA2017-07-098 |
| | : | O P I N I O N |
| | | 12/4/2017 |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2013-0310 – JN 2013-0316


Amy R. Ashcraft, P.O. Box 172, Seven Mile, Ohio 45062, attorney and guardian ad litem for S.A., J.A., Th.L., A.L., Ti.L.

Jeannine C. Barbeau, 3268 Jefferson Avenue, Cincinnati, Ohio 45220, attorney and guardian ad litem for C.L.

Dawn S. Garrett, 9435 Waterstone Blvd., Cincinnati, Ohio 45249, for D.L.

Lorraine McBride Search, 215 South Sutphin Street, Middletown, Ohio 45044, for appellant, Mother

Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Department of Job and Family Services


**RINGLAND, J.**

{¶ 1} The mother ("Mother") of S.A., J.A., Ti.L., D.L., A.L., C.L., and Th.L. (referred to

collectively as the "children") appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to appellee, Butler County Department of Job and Family Services ("BCDJFS").

{¶ 2} On May 28, 2013, BCDJFS filed a complaint alleging abuse, neglect, and dependency, and requested a protective supervision order. The complaint followed an altercation where Mother's second husband and biological father to four of the children, ("Father-2"), caused serious physical harm to C.L. The juvenile court granted an emergency protective order and scheduled a shelter care hearing for the next day. At the hearing, Mother agreed to BCDJFS's request for protective supervision and to have neither contact with Father-2 nor discuss the case with the children. Mother failed to comply with these restrictions, and on July 8, 2013, BCDJFS requested emergency removal of the children from Mother's custody.

{¶ 3} BCDJFS based its request upon allegations Mother was conspiring with Father-2 to attempt to gain Father-2's release from jail and dismissal of his pending charges. BCDJFS further supported its request with recorded conversations between Mother and Father-2 wherein Mother is heard using vulgar and derogatory language towards the children. Mother made statements to or about her children, such as, but not limited to, "wh***," "you wh***, I'll drop your f*****g ass in the river, you wh***," "I hate these kids, I wish they would die," "bi**h, you snotty, ungrateful, bi**h," and "c**t." During grand jury proceedings in Father-2's case, Mother attempted to recant her previous story regarding the physical harm Father-2 caused against C.L. Consequently, Mother was convicted of perjury and served seven months of a one-year prison sentence.

{¶ 4} After Mother was charged with perjury, but prior to her conviction, the juvenile court granted BCDJFS' emergency request for temporary custody, granted Mother supervised contact with the children, and scheduled a shelter care hearing for July 9, 2013.

Following several continuances, the juvenile court held the shelter care hearing on November 8, 2013 and Mother agreed to a finding of dependency for all seven children and a finding of abuse with respect to C.L., naming Father-2 as the perpetrator of the abuse. At the time of the hearing, Father-2 was serving a three-year prison sentence for the physical harm caused to C.L. BCDJFS developed a case plan with the goal of reunification with Mother. The original case plan included completing domestic violence and psychological assessments and following any recommendations therefrom, signing any requested releases, and obtaining and maintaining stable housing and employment.

{¶ 5} Mother began initially working towards achieving her case plan goals, but her progress stalled in March 2014 for seven months due to her incarceration for perjury. While incarcerated, Mother attended several mental health and domestic violence group and individual counseling sessions. Following her release, the case continued towards reunification, and in October 2014, the juvenile court granted Mother's request for temporary custody with respect to S.L. The juvenile court progressively returned the children to Mother's care and by March 2015, the juvenile court had returned five of the six remaining children. At no point during the pendency of this case did J.A. return to Mother's care.

{¶ 6} On April 21, 2015, BCDJFS filed for an emergency order requesting the return of the six children back to BCDJFS' temporary custody and filed for permanent custody of all seven children. BCDJFS based its request upon allegations by the children that Mother verbally and physically abused them. The juvenile court granted the ex parte order for temporary custody. Following a contested shelter care hearing on April 28, 2015, the juvenile court continued its order for temporary custody.

{¶ 7} On May 11, 2016, BCDJFS requested an emergency order suspending Mother's visitation based upon recommendations from the children's individual therapists. The juvenile court granted the request and held a shelter care hearing on May 25, 2016.

Following the hearing, the juvenile court continued the suspension of visitation and found a lack of credible evidence that reinstatement of visitation would be "therapeutically beneficial" to the children, and considerable evidence that it would be "harmful" to the children.

{¶ 8} On July 6, 2016, the juvenile court held the first of several permanent custody hearings. BCDJFS and Mother presented extensive evidence throughout the duration of the permanent custody hearings. BCDJFS presented the testimony of the three caseworkers assigned to Mother's case, the children's individual therapists, S.L.'s Foster Mother ("FM-1"), and S.A., D.L., C.L., Th.L., and J.A.'s Foster Mother ("FM-2"). Mother testified on her own behalf, as well as presented the testimony of one of her counselors and her niece. The evidence presented at the hearings revealed the following facts.

{¶ 9} Tara Eve, the first caseworker assigned to this case from June 2013 to June 2015, testified regarding removal of the children, Mother's engagement with case plan services and visitation, and the basis for the permanent custody motion. Eve explained that the children had re-entered foster care due to the children's allegations of physical and verbal abuse. She testified BCDJFS provided extensive efforts to accomplish reunification and that reunification did occur, but was ultimately unsuccessful. Eve further stated that permanent custody was in the best interest of the children and their only chance at permanency.

{¶ 10} Shanna Colburn, the second caseworker assigned to this case from June to October 2015, testified that following the second removal Mother was required to re-engage in domestic violence services, but as the aggressor rather than the victim. Colburn explained that Mother informed BCDJFS she was receiving such treatment at Milford Psychiatry. However, despite multiple attempts by Colburn, Milford Psychiatry verified Mother was in counseling, but not that she was engaged in the specific services as required by her case plan. During most of this period, Mother had fairly consistent visitation attendance, which became inconsistent over time and was ultimately suspended. Colburn testified the children

demonstrated affection for Mother, but described the visits as overwhelming and chaotic.

{¶ 11} Sachi Slater, the third and final caseworker assigned to this case beginning in October 2015, testified she experienced the same difficulty in obtaining verification from Milford Psychiatry regarding the specific services it provided to Mother. Thus, at the time of the visitation suspension, the domestic violence aggressor counseling remained outstanding and BCDJFS had no record substantiating Mother's successful completion of the service. Therefore, Slater testified BCDJFS continued to have "concerns about Mother's protective capacities and her ability to keep the children safe."

{¶ 12} S.L.'s therapist testified that S.L. receives therapeutic services because she exhibits traumatic and depressive symptoms, social and emotional withdrawal, and negative behaviors. S.L. is diagnosed with post-traumatic stress disorder ("PTSD") and adjustment disorder with depressed mood. S.L. expressed to her therapist that contact with Mother was unhealthy and harmful to her. S.L.'s therapist opined S.L. "continues to struggle with aggression towards others and emotional and physical withdrawal when she is upset." S.L.'s therapist further provided that S.L. informed her that she suffered verbal and physical abuse by Mother. Following the second removal, S.L.'s anxiety and behavioral concerns have improved, but not fully subsided and her siblings remain triggers for her. S.L.'s current placement is a foster-to-adopt home.

{¶ 13} J.A. and A.L.'s therapist testified next. She testified J.A. is diagnosed with PTSD, suffers from anxiety, depression, and suicidal ideation, and has demonstrated destructive and aggressive behaviors. Similarly to S.L., J.A.'s behavioral concerns have improved since the second removal, but have not fully subsided. J.A. indicated an unwillingness to attend visitation with Mother. A.L. is also diagnosed with PTSD and receives therapy for demonstrating destructive and aggressive behaviors. A.L.'s therapist opined that Mother is a significant trigger for A.L.'s trauma symptoms. A.L.'s foster family has expressed

a desire to adopt him and Ti.L. Ti.L. is diagnosed with PTSD and has demonstrated significant trauma symptoms impeding her ability to function at home and school. These symptoms intensified during reunification and Ti.L. has expressed fear related to seeing Mother, who is a significant trigger for Ti.L.'s trauma.

{¶ 14} D.L.'s therapist testified D.L. is diagnosed with PTSD and suffers from significant trauma symptoms. D.L.'s therapist explained Mother is a trigger for his trauma. She stated clear disruptions with D.L.'s foster family occurred following discussions about future visits and telephone conversations with Mother. D.L.'s therapist expressed concerns with re-exposing D.L. to triggering events and that although he has shown improvement concerns remain regarding his aggressiveness.

{¶ 15} Th.L. is diagnosed with PTSD and adjustment disorder with depressed mood. Th.L. is fearful of anything that reminds him of past trauma and is still afflicted with nightmares associated with his time living with Mother. Th.L.'s therapist opined that contact with Mother may increase his depressive symptoms. Unlike his siblings, Th.L. has not demonstrated destructive and aggressive behaviors, but has experienced anxiety and depression. C.L. is diagnosed with PTSD, which her therapist described as more significant than the other children, including auditory and visual hallucinations. C.L. has demonstrated destructive and aggressive behaviors triggered by reminders of past trauma.

{¶ 16} FM-2 testified regarding the children's various medical afflictions and behavioral issues detailed above. FM-2 explained that each child showed signs of improvement with their respective behavioral concerns while in her care and demonstrated signs of regression during their respective periods in Mother's care. Beyond the behavioral concerns, FM-2 did not identify any issues with Mother's parenting from her observations during visitation and stated the children appeared bonded with Mother.

{¶ 17} Mother testified on her own behalf. Mother explained her history of domestic

violence with Father-2 and his abuse of C.L., which set in motion the series of events leading to the children's first removal. Mother testified the children developed their aggressive behaviors while in the temporary custody of BCDJFS, which she observed during visitation. Before their removal, Mother claimed the only indications of behavioral concerns were the result of normal sibling interaction. However, upon re-visiting the children's behavioral concerns on cross-examination, Mother stated the children did have violent and aggressive behavior prior to removal. Mother did acknowledge her deficiencies as a parent before removal, but claimed she is ready to parent some of the children. In so doing, Mother denied all allegations of physical and verbal abuse. On cross-examination, Mother acknowledged verbally abusing the children prior to the first removal when confronted with recordings of her jailhouse telephone conversations with Father-2. The conversations occurred in violation of a no-contact order. Furthermore, Mother explained that she wanted all of her children, but felt J.A., S.A., and C.L., were presently incapable of residing with her.

{¶ 18} Finally, Mother's counselor and her cousin both testified. Mother's counselor explained that between May 2015 and February 2016, she provided standard counseling services over eight sessions and two assessments. Mother's counselor provided general counseling, but did not provide specific services catered to the requirements of Mother's case plan. Mother's cousin opined that Mother gained confidence as a mother and in controlling motherly situations. Mother's cousin further testified the children's grandmother could provide an adequate residence for the children and Mother.

{¶ 19} Following the conclusion of the hearings, the magistrate granted BCDJFS' permanent custody motion. Mother objected to the magistrate's findings. The juvenile court held a hearing on the matter, and then, overruled Mother's objections. The present appeal followed.

{¶ 20} Assignment of Error No. 1:

- 7 -

{¶ 21} THE JUVENILE COURT'S JUDGMENT GRANTING THE MOTION FOR PERMANENT CUSTODY TO BUTLER COUNTY CHILDREN SERVICES ("[BCDJFS]") WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 22} Mother asserts the juvenile court erred by granting permanent custody of the children to BCDJFS because its decision was not supported by clear and convincing evidence and against the manifest weight of the evidence. Specifically, Mother contends BCDJFS presented no evidence of her physically abusing the children; an allegation that she denied throughout the case. Mother further contends the juvenile court erred in finding Mother abandoned the children.

{¶ 23} "The rights to conceive and to raise one's children have been deemed 'essential' * * *." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972), quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Despite the fact that we have found that parents who are suitable have a paramount right to raise and care for their children, it is equally well settled that '[t]he fundamental interest of parents is not absolute.'" (Citations omitted.) *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 40. "The constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *Id.* "The state's power to terminate parental rights is circumscribed * * *." *Id.* at ¶ 41, citing *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). However, "when that authority is properly invoked, it is fully proper and constitutional to remove children from their parents' care. [S]uch an extreme disposition is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." *In re AsF(F)*, 12th Dist. Madison Nos. CA2016-05-020 and CA2016-05-021, 2016-Ohio-7836, ¶ 12, quoting R.C. 2151.01(A).

{¶ 24} The state must prove by clear and convincing evidence that the statutory

standards for permanent custody have been met before a natural parent's right to custody can be terminated. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); *In re E.G.*, 12th Dist. Butler No. CA2013-12-224, 2014-Ohio-2007, ¶ 6. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). This court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. An appellate court will not reverse a finding by the juvenile court that the evidence was clear and convincing absent sufficient conflict in the evidence. *Id.*

{¶ 25} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. When considering a manifest weight of the evidence challenge, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts, the trial court clearly "lost its way" and created such a "manifest miscarriage of justice" that the judgment must be reversed and a new trial ordered. *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 10.

{¶ 26} "Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test." *In re T.P.*, 12th Dist. Clermont No. CA2016-03-012, 2016-Ohio-5780, ¶ 13. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). In so doing, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in R.C. 2151.414(D). Second,

the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions.  R.C. 2151.414(B)(1)(a) thru (e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10.  To satisfy part two of the permanent custody test, only one of the above five findings need be met.  *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶ 27}  R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 28}  In granting BCDJFS' motion for permanent custody, the juvenile court

considered each of the best interest factors in light of the evidence presented at the hearings. With respect to the first statutory factor, the juvenile court found that prior to the commencement of the present case the children resided with Mother and Father-2 in an extremely violent household. The juvenile court noted that following Father-2's arrest for physically abusing C.L., BCDJFS did not immediately remove the children from Mother's care. Father-2 remained incarcerated and Mother engaged in hundreds of telephone conversations with Father-2 in violation of a no-contact order. These conversations indicated Mother's intention to conceal information to the grand jury regarding the physical abuse of C.L. in hopes of achieving Father-2's release from jail. The telephone conversations further revealed Mother's use of "extremely verbally abusive" language towards the children. The juvenile court noted Mother initially denied the verbal abuse until confronted with the actual recorded calls on cross-examination. Ultimately, BCDJFS removed the children from Mother's care and Mother was subsequently convicted of perjury.

{¶ 29} The juvenile court found that upon Mother's release from prison, she worked towards reunification and had six of the seven children returned to her care, excluding J.A. The juvenile court found that the children's relationship with Mother deteriorated over time, especially following the second removal of the children from Mother's care. The juvenile court noted there were observations of some bonding and affection between Mother and the children prior to the second removal. However, the juvenile court further found Mother's failure to attend visitation and meet with the visitation center to address such failure hindered this affection, resulting in the juvenile court suspending visitation in 2016.

{¶ 30} Finally, the juvenile court found the children each individually suffer from various afflictions, such as Chronic PTSD, increased anxiety, depression, and suicidal ideations. Throughout the pendency of this case, the children have been placed in multiple foster care placements and have struggled with destructive and aggressive behaviors. The

degree of each individual child's difficulties varies, but each child demonstrates behavioral concerns.

{¶ 31} In consideration of the second statutory factor, the juvenile court conducted in camera interviews with the individual children and considered the report and recommendations of the two guardians ad litem, who both recommended a grant of permanent custody. Apart from D.L., the children expressed their desire not to return to Mother's care. The guardian ad litem ("GAL-1") for D.L. and C.L. expressed that Mother failed to demonstrate the ability to consistently parent, protect, and provide for the children. GAL-1 further provided that after more than three years, the best interest of D.L. and C.L. are not served by extending the case. Rather, D.L. and C.L. are in need of a legally secure placement and cannot and should not be placed with Mother now or within a reasonable period. The guardian ad litem ("GAL-2") for the remainder of the children concurred with GAL-1 and opined that permanency can only be achieved with a grant of permanent custody.

{¶ 32} With respect to the third statutory factor, the juvenile court reviewed the children's custodial history and found all seven children were adjudicated dependent and C.L. abused, and that the children had been in the temporary custody of BCDJFS for 12 or more months of a consecutive 22-month period.

{¶ 33} In considering the fourth statutory factor, the juvenile court found the children's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody to BCDJFS. Specifically, the juvenile court found Mother has completed an extensive number of case plan services, but still has failed to put herself in a position to assume her parental responsibilities, now or in the near future. Rather, Mother failed to successfully remedy the behaviors and concerns, which twice caused the children's removal. The juvenile court again identified the children's various psychiatric diagnoses, behavioral concerns, and extensive trauma suffered.

{¶ 34} Additionally, the juvenile court considered the factors enumerated in R.C. 2151.414(B)(1). The juvenile court found Mother abandoned the children because she had no contact with them since November 2015. The juvenile court further found Mother failed to substantially remedy the conditions causing the children's removal, demonstrated a lack of commitment to the children, and abused the children.

{¶ 35} Based on these findings, the juvenile court determined by clear and convincing evidence that it was in the children's best interest to grant permanent custody to BCDJFS. After thoroughly reviewing the record, we find the juvenile court's determination regarding the best interest of the children is supported by clear and convincing evidence and not against the manifest weight of the evidence. Though Mother has made efforts to meet the requirements of her respective case plan and has demonstrated a bond with the children, albeit a diminishing bond, there are compelling reasons to weigh the best interest factors in favor of permanent custody to BCDJFS.

{¶ 36} Mother argues the juvenile court improperly relied on the children's hearsay statements presented at a shelter care hearing to support its finding Mother abused the children. Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Evid.R. 802 provides that, with certain exceptions, hearsay is not admissible at trial. Juv.R. 34(B)(2) and (I) permit hearsay evidence in juvenile proceedings with the exception of permanent custody hearings. *See also In re M.C.*, 12th Dist. Butler Nos. CA2014-05-098 and CA2014-05-099, 2014-Ohio-4521, ¶ 47 ("[p]ermanent custody hearings are the exception to the general rule that hearsay can be considered in juvenile custody dispositions").

{¶ 37} While Mother correctly asserts that BCDJFS elicited hearsay evidence regarding the children's allegations of physical abuse during a shelter care hearing, her argument fails to acknowledge the evidence presented in support of such allegations during

the permanent custody hearings. Tara Eve, the first caseworker assigned to Mother's case testified regarding D.L.'s report to her following the second removal that Mother verbally and physically abused him during reunification. Moreover, Mother's counsel elicited this testimony regarding D.L.'s report during cross-examination. Thus, Mother cannot claim error with respect to its admittance. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 102 (stating the invited error doctrine prevents a party from taking advantage of any alleged error that the party herself invited or induced).

{¶ 38} BCDJFS elicited further testimony regarding the children's allegations of abuse. S.A.'s therapist testified S.A. informed her "that her biological mother * * * would hit her[,] * * * slam her head against the wall, * * * call her profane names," was often drunk, and mentioned Mother would hold the bedroom door closed and not let her leave. These allegations referenced both prior to the initial removal and prior to the second removal. Mother's counsel objected to the admission of this testimony. The juvenile court overruled Mother's objection and admitted the statement pursuant to Evid.R. 803(4). The evidence rule provides a hearsay statement may be admitted "for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4).

{¶ 39} "A trial court has broad discretion in the admission and the exclusion of evidence and unless it clearly abused its discretion and appellant is materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Martin*, 12th Dist. Butler No. CA2007-01-022, 2007-Ohio-7073, ¶ 9, citing *State v. Finnerty*, 45 Ohio St.3d 104, 109 (1989). An abuse of discretion is more than an error of law or judgment. Rather, it suggests the "trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8. "A review

under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14.

{¶ 40} Contrary to Mother's claim otherwise, the juvenile court did not err in admitting S.A.'s therapist's testimony regarding the allegations of abuse. S.A.'s therapist specifically testified that S.A.'s "treatment plan was to reduce her trauma symptoms as well as to address barriers to her depression [and] communicating that depression to her caregivers." Thus, S.A.'s therapy focused on her prior trauma, and "[S.A.] basically just tells her story of every * * * traumatic event that she can remember, and she works through the emotions she was feeling at that time and developing coping skills for how she could work through those memories as she remembers them going forward." Considering the testimony in conjunction with S.A.'s treatment plan, the juvenile court did not abuse its discretion by permitting the testimony pursuant to the hearsay exception.

{¶ 41} S.A.'s treatment plan specifically involved S.A. discussing traumatic events with her therapist to develop skills to cope with them and move forward. Physical and verbal abuse by one's mother, such as hitting the child or slamming the child's head against a wall, is the type of traumatic event underlying S.A.'s depressive symptoms her therapist hoped to improve upon. Therefore, S.A. made the statements for the purpose of treating her present depressive symptoms. *In re Swisher*, 9th Dist. Summit No. 17952, 1997 Ohio App. LEXIS 1603, *15 (Apr. 23, 1997); *see also State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 56 (holding Evid.R. 803[4] applies to statements made to psychological caregivers, therapists, and social workers). Accordingly, the juvenile court did not abuse its discretion in admitting the statements.

{¶ 42} Additionally, Sachi Slater, the second caseworker assigned to this case answered affirmatively that "[t]he allegations [of abuse] were * * * not only [that Mother] slap[ped the children] with an open hand[, but also that she] slapped them on top of the

- 15 -

head, pulled their hair, slammed their heads against the wall, shov[ed] them to the ground, and kick[ed] them". Slater stated she does not consider such allegations a form of corporal punishment or discipline. Rather, Slater acknowledged the allegations gave rise to concern in placing the children with Mother. In addition to the physical abuse allegations, Slater affirmatively recognized the individual statements Mother made to children underlying the juvenile court's findings of verbal abuse.

{¶ 43} Mother did not object to the admission of Slater's testimony; therefore, our review concerning the admission of Slater's testimony is limited to plain error. *In re Lay*, 12th Dist. Butler No. CA97-06-115, 1998 Ohio App. LEXIS 2007, *4 (May 4, 1998). Plain error review is not favored in civil cases and is defined in such context as an error that "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. Appellate courts will only recognize plain error in extremely rare cases with exceptional circumstances. *In re E.J.,* 12th Dist. Warren No. CA2014-07-098, 2015-Ohio-731, ¶ 10.

{¶ 44} This case does not present exceptional circumstances requiring a finding of plain error with respect to Slater's testimony because it was merely cumulative of prior testimony by Tara Eve and S.A.'s therapist. *In re Mosley*, 12th Dist. Butler No. CA93-06-111, 1994 Ohio App. LEXIS 1719, *6 (Apr. 25, 1994) (holding the admission of hearsay testimony that was cumulative of prior properly admitted testimony did not rise to the level of plain error). Thus, even assuming the juvenile court improperly admitted Slater's testimony, because the testimony simply restated the prior properly admitted testimony of two witnesses, any such error would not rise to the level of the plain error.

{¶ 45} Collectively, the testimony regarding the allegations of physical and verbal abuse meets the clear and convincing standard supporting the juvenile court's findings.

Further, the juvenile court's findings are not against the manifest weight of the evidence. Mother adamantly denied any such abuse and blamed the foster families for manipulating the children into making the allegations. However, the juvenile court found Mother's testimony lacked credibility. Specifically, the juvenile court observed

> a remarkable change in Mother's demeanor at various times throughout the hearing, at times appearing contrite, and very much the victim. Mother was unable to maintain that demure, pleasant demeanor beyond direct examination * * * and appeared demonstrably aggressive, hostile and manipulative when confronted with contradictions in the evidence.

The juvenile court further questioned "Mother's veracity throughout her testimony in almost every respect." In weighing this conflict in the evidence, we are mindful that the juvenile court was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Mays*, 12th Dist. Clermont No. CA2012-05-038, 2013-Ohio-1952, ¶ 20. Accordingly, we find BCDJFS presented competent, credible evidence of Mother's abuse of the children.

{¶ 46} We next turn to Mother's abandonment argument. Considering the juvenile court found all seven children were adjudicated dependent and C.L. abused, and that the children had been in the temporary custody of BCDJFS for 12 or more months of a consecutive 22-month period, we find Mother's abandonment argument moot. As discussed above, the juvenile court need only make one of the five findings enumerated in R.C. 2151.414(B)(1)(a) thru (e). *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12. The juvenile court made the 12 or more months of a consecutive 22-month period finding, which was supported by clear and convincing evidence, thereby rendering any alleged error in finding abandonment moot.

{¶ 47} Mother does not challenge the juvenile court's findings with respect to the remaining factors. Nonetheless, after a thorough review of the record, we find the remainder

- 17 -

of the juvenile court's findings are supported by clear and convincing evidence and not against the manifest weight of the evidence.

{¶ 48} Accordingly, Mother's assignment of error is overruled.

{¶ 49} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.